35 F.3d 556
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Pete J. REED, Plaintiff-Appellee,
v.
MARITRANS OPERATING PARTNERS LIMITED PARTNERSHIP, Defendant-Appellant.
 No. 93-1259.
 United States Court of Appeals, Fourth Circuit.
 Argued March 9, 1994.
Decided August 29, 1994.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Herbert F. Murray, Senior District Judge. (CA-91-1908-HM).
 ARGUED: Stuart M. Goldstein, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for appellant.
 Kenneth Paul Niman, Kaplan, Hewman, Greenberg, Engelman & Belgrad, P.A., Baltimore, MD, for appellee.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and BRINKEMA, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Pete Reed (Reed) brought this action against his employer, Maritrans Operating Partners Limited Partnership (Maritrans), alleging negligence and unseaworthiness on the part of Maritrans under the Jones Act, 28 U.S.C. Sec. 688, and general federal maritime law. The case was removed to the United States District Court for the District of Maryland.
 
 
 2
 The case was tried to a jury, which found Maritrans liable for Reed's injuries and awarded $44,815.72 in lost wages, $200,000 for pain and suffering, and $6,660 for maintenance. The jury found that any unseaworthiness of the vessel did not contribute to Reed's injuries. The court denied Maritrans' post-trial motions for judgment as a matter of law or for a new trial, and Maritrans now raises the same issues in this appeal. For the reasons stated below, we affirm.
 
 I.
 
 3
 At the age of 18, Reed entered training to become a merchant seaman. In January 1973, he completed his training and began sailing as a "messman." After accumulating sufficient hours at sea, in October 1975 Reed sat for and passed the exam that certified him as an able-bodied (A.B.) seaman.
 
 
 4
 From 1975 until 1987, Reed worked almost exclusively on large, deep sea vessels. In 1987, Reed began work for Maritrans, which apparently works exclusively with tugs and barges close to shore. Reed stated that he made this change to reduce the length of time he spends away from his family. From the time he began work with Maritrans until the time of the incident in question, Reed was assigned to five different Maritrans-operated tugs, including the ENTERPRISE, the one on which the incident took place. He was assigned to be a relief worker, i.e., he filled in as a crew member when a member of the permanent crew was absent. As such, he moved from ship to ship and crew to crew depending on the needs of his employer, and was subject to different jobs and different approaches to those jobs with each new assignment.
 
 
 5
 Reed first boarded the tug ENTERPRISE on April 20, 1988. He stated at trial that his condition was good at the time he boarded the ship, although he was having pain in his leg, which apparently was the result of bursitis. Before boarding the ship, he testified that he told the Maritrans personnel director about the pain by saying he had a "cold in his leg," which was his interpretation of the doctor's description of bursitis. He stated that otherwise his health was good and that he had no pain in his back at the time.
 
 
 6
 Reed boarded the ship by walking the gangplank to a barge, crossing the barge and then climbing down a ladder (estimated by Reed to be about 30 feet in height) to the tug located to the stern of the barge, jumping several feet to the deck of the tug at the bottom. He carried all his winter gear in a satchel with him as he boarded the tug. After going on board, he stowed his gear and made up his bunk. At the beginning of his first assignment, from 6 p.m. to midnight, the captain instructed Reed to make the tug fast to the barge. Reed testified that he asked the captain how he wanted it done, to which the captain replied that he should just go do it. Reed asked if he would have any assistance, and the captain said no.[1] According to Reed, on "[e]very other tug they had an A.B. or engineer off watch work with you" in securing the tug and barge.
 
 
 7
 Reed then proceeded to the bow of the tug. The bow of the tug was nestled within a V-shaped notch in the stern of the barge. Reed was tasked with drawing the two tightly together using a complex rope and anchor system. The description of this procedure is quite complex, absent a visual representation of the specific structures on both barge and tug involved. Suffice it to say that on the tug there is a large stationary structure called an H-bit that is used to tie off rope. A large rope is secured around the H-bit, after which the end is passed around a shackle on the barge and returned to the tug. It is there secured around the H-bit. Next to the H-bit stands a capstan, a motorized winch-like piece of deck machinery that is used to pull lines. It consists of a round drum on a frame. A line can be wrapped around the drum, which then rotates, causing the line to be tightened.[2] Once the capstan is turned on, some of the slack in the line is placed over it and it rotates and draws the line taut, after which a final knotting on the H-bit occurs.
 
 
 8
 While it is agreed that Reed started the process, what exactly happened is unclear. Reed testified that he began to thread the line through the H-bit and then through the shackle. He says that the captain called down to him from the bridge and told him to position the line on the H-bit a different way. Reed testified that he followed the captain's orders and then brought the line back around the H-bit and then started the capstan. He then looped the line around the capstan. He recounted at trial what happened next:
 
 
 9
 It drawed up tight. When it drawed up tight it stopped and I proceeded to take the haul apart, which when it's turned the line is coming toward you because it's pulling up tight, it's coming off the capstan, and when it stopped I proceeded to the H-bit, started to proceed to the H-bit to put my figure 8's on it. When I got ready to turn with the line in my hand the capstan backed down on me and went in reverse under a heavy strain and jerked me forward and backward and I fell.
 
 
 10
 J.A. 48a. Reed testified that such movement is unusual. A capstan is supposed to draw up the extra line and then come to a stop (otherwise the line would break). One of the theories of Reed's case was that the capstan malfunctioned by jerking forward or back after it had stopped, causing him to fall and be injured. (This was the heart of his unseaworthiness claim.) He testified differently on direct examination and cross examination as to what happened next. On direct, he stated that he got up and went to the rail, and that he was leaning there when the captain appeared and finished tying up the line. On cross, he stated that he got up, leaned on the rail, and then went back to tying up the line on the H-bit, at which point the captain appeared and took the line from his hand and completed the job. At some point, Reed told the captain that his back hurt, and the captain told him to go lie down and take some Tylenol, which he did.
 
 
 11
 The captain's story is markedly different. According to his story, he did not tell Reed early on to rethread the rope. Instead, he says that he did not watch the initial phases of the operation, although he could see Reed from the lower wheelhouse where he was located. At some point, though, he says he heard the capstan running. When the captain looked out, Reed already had placed the line on the capstan and started to draw up the slack.
 
 
 12
 I looked down on the bow to make sure that Mr. Reed had the bow line out properly. I noticed that the line was not tight, the line was jammed, it wasn't in, it wasn't done properly.... I dropped the window, I tried to explain to Mr. Reed the correct way to turn the line. The bite of the line had a twist in it.
 
 
 13
 So I tried to explain to Mr. Reed that you would have to take this eye off, you got to turn it over and put this part on the bottom, but he couldn't understand exactly what I wanted to do there, so then I felt like I should go down on deck and I would assist him and get a little closer and I would be able to show him the proper way in which I wanted it done.
 
 
 14
 J.A. 223a, 227a. The captain stated that he then went down, and Reed was standing by the capstan waiting for him. The captain asked him to give him some slack by reversing the capstan and then the captain took the line and reordered it and told Reed to tighten it back up. Reed did all this, but after putting the third or fourth wrap on the capstan in the tightening process, he reached back to his back and told the captain that he had done something to his back. The captain then told him to lie down.
 
 
 15
 Reed went to his bunk and remained there for the entire voyage. When the tug docked two days later, Reed was removed by paramedics on a stretcher. He was admitted to Methodist Hospital in Philadelphia, where examination showed he had suffered a herniated disc. He was then transferred to Johns Hopkins. On May 4, 1988, his doctor performed surgery, and he was discharged on May 11. Reed then recuperated at home and received physical therapy. His condition did not improve significantly, and his doctor attempted alternative approaches before performing a second operation in July 1989. He remained under care until he ultimately returned to work in August 1990. During this period of recuperation and recovery, Reed received maintenance payments from Maritrans from April 23 to December 31, 1988, and from June 5 to October 31, 1989. In both instances, Maritrans on its own decided that Reed had reached maximum medical cure and that maintenance therefore was not necessary.
 
 
 16
 Subsequently, Reed brought this action against Maritrans. Three central claims went to the jury: first, that Maritrans was negligent and that this negligence contributed to Reed's injury; second, that the ENTERPRISE was unseaworthy because of the faulty capstan, and that this condition contributed to Reed's injury; and finally that Maritrans failed to provide maintenance to Reed during his post-injury recuperation as required under general maritime law. Maritrans moved for judgment as a matter of law at the close of Reed's case, and after all the evidence was presented. The judge let the case go to the jury.
 
 
 17
 The jury was given a special verdict form on which it found as follows: first, the jury found that Reed injured his back on the ENTERPRISE on April 20. Second, it found that the negligence of Maritrans caused Reed to injure his back. Third, while not asked directly whether the tug was unseaworthy, the jury stated that it did not find any unseaworthiness of the tug to have caused Reed to injure his back. The jury found no contributory negligence by Reed, and also that Reed did not have an existing medical problem with his back before he boarded the tug. The jury then found Reed entitled to lost wages of $44,815.72, pain and suffering of $200,000, and maintenance of $6,660.
 
 II.
 
 18
 Maritrans' first contention on appeal is that the district court erred in failing to enter judgment as a matter of law as to the negligence claim because, in its view, the evidence failed to demonstrate causative negligence on the part of Maritrans. We review this matter de novo. Parker v. Prudential Ins. Co. of America, 900 F.2d 772, 776 (4th Cir.1990).
 
 
 19
 To understand whether a claim in a Jones Act case should be resolved on a motion for judgment as a matter of law, it is first necessary to understand the causation standard applicable in such cases, for only those who know what they seek can know whether they have found it. "Under the Jones Act, the standard of recovery has not been a strict one." Estate of Larkins v. Farrell Lines, Inc., 806 F.2d 510, 512 (4th Cir.1986), cert. denied, 481 U.S. 1037 (1987). Indeed, the plaintiff's burden of proof is "very minimal and has been referred to as 'featherweight.' " Caldwell v. Manhattan Tankers Corp., 618 F.2d 361, 363 (5th Cir.1980) (citations omitted). Thus, although there must be shown to have been negligence on the part of the shipowner, the role of such negligence in causing the seaman's injury need not be as direct as that in a regular tort case; indeed, a "[d]efendant must bear responsibility if his negligence played any part, even the slightest, in producing the injury." Chisholm v. Sabine Towing & Transp. Co., 679 F.2d 60, 62 (5th Cir.1982) (citations omitted) (emphasis supplied).
 
 
 20
 This proof standard is important to bear in mind when considering a motion for judgment as a matter of law. Given this light burden of proof and the relaxed correlation between negligence and injury,
 
 
 21
 [t]he submission of such a case to a jury requires a very low evidentiary threshold and even marginal claims are properly left for jury determination. Thus, it has been held that a directed verdict may only be granted in a Jones Act suit when there is a complete absence of probative facts to support the non-movant's claim.
 
 
 22
 Caldwell, 618 F.2d at 363 (internal quotations and citations omitted) (emphasis supplied). Accord Estate of Larkins, 806 F.2d at 512 ("The jury's role, moreover, has been an important one in such cases, and doubts have been resolved in favor of submission."). Of course, the court also, as with any motion for judgment as a matter of law, looks at the evidence in the light most favorable to the non-moving party and gives him the benefit of all reasonable inferences that arise from the evidence. Brendle's Stores, Inc. v. OTR, 978 F.2d 150, 157 (4th Cir.1992). Finally, the question before the court is not whether the non-moving party has introduced sufficient evidence to withstand the motion, but simply whether there is enough evidence in the record, from whatever source, to withstand the motion; thus, where the evidence introduced by the moving party provides a part of the story favorable to the non-movant, the court acts properly in examining this evidence as well before coming to its conclusion. 5A James W. Moore & Jo Desha Lucas, Moore's Federal Practice p 50.02 at 50-35 (1994).
 
 
 23
 Turning to the question at hand, we do not think the judge erred in refusing to grant the motion. Reed walked onto the ship, climbing down a 30 ladder, and then made up his upper bunk before beginning the assigned task of securing the tug to the barge. He had to be transported off the tug on a stretcher. There is sufficient evidence of injury. The major question is whether there is any evidence of Maritrans' negligence and its causation of the injury. While the evidence seems mixed, there was sufficient evidence introduced to send the case to the jury. Even ignoring the capstan malfunction issue, there is evidence that the captain refused to provide additional crew members to assist Reed in doing the job correctly.[3] The captain also refused to instruct Reed on how to do the task. As Reed was doing it, the captain stated that he looked down and saw Reed threading the lines incorrectly and that the capstan had become jammed as a result. He then had to go down and assist Reed. Reed testified that in this time period, while he was handling the line it surged in his hand and he was thrown to the ground. There is some evidence that the jamming was the cause of this accident. Thus, based on this very light standard, the jury could conclude that Maritrans, through its captain, was negligent in failing either to provide assistance to Reed or to instruct Reed on the proper tie up procedure, which he never had performed alone before, and that that negligence contributed to the resulting surging of the line and injury to Reed's back.
 
 
 24
 The Jones Act is solicitous of the health and safety of those brave souls who choose to make their living in the dangerous environs of the sea. Faced with difficult and taxing jobs that are necessary to the continued operation of a national and international economy, the Jones Act aims to protect their safety and to assure them of recovery from injury that they receive as a result of employers who do not support their dangerous assignments with safe working conditions. Because of the great danger and necessity of these jobs, Congress and the courts have established a legal system that guarantees to employees recovery of the costs from their employers resulting from injuries incurred on the job even when the causative tie between employee injury and employer negligence is slight. While we believe that the evidence might be characterized as slight here, still it meets the relaxed test that is the distinctive mark of such cases. The district court did not err in denying the motion for judgment as a matter of law.
 
 III.
 
 25
 Maritrans argues that the trial court committed reversible error in not granting a new trial because, according to Maritrans, there is an inconsistency between the fact that the jury found that the capstan was not unseaworthy and that the company was negligent. A motion for a new trial is addressed to the sound discretion of the trial court, and "its action thereon will not be disturbed on appeal unless such an action constitutes a manifest abuse of discretion." Wadsworth v. Clindon, 846 F.2d 265, 266 (4th Cir.1988).
 
 
 26
 We must first note that the alleged inconsistency of response complained of comes from a verdict form drafted by Maritrans itself. While that does not solve the question of the inconsistency, we must admit a certain lack of sympathy for a party who submits a verdict form and then complains that it allowed the jury to act in an inconsistent manner.
 
 
 27
 More directly, however, we simply reject Maritrans' contention that the jury's finding that there was no causative link between any unseaworthiness and Reed's injury and its further finding of causal negligence on these facts are completely inconsistent. "When the use of a special verdict form leads to apparently conflicting jury findings, the court has a duty under the seventh amendment to harmonize the answers, if it is possible to do so under a fair reading of them." Gosnell v. Sea-Land Service, Inc., 782 F.2d 464, 466 (4th Cir.1986). Here, there is no true inconsistency, despite Maritrans' best efforts to conjure one. First, it must be pointed out that the jury verdict did not find, as Maritrans repeatedly states, that there was no unseaworthiness; rather, it answered in the negative the question "Do you find that any unseaworthiness of the tug ENTERPRISE caused plaintiff to incur injury to his back on April 20, 1988?", which focused not on whether there was any unseaworthiness but on the causal link between any unseaworthiness and the injury. Of course, the causation standard involved in a Jones Act negligence claim is substantially more relaxed than in an unseaworthiness claim, so that it is possible to find that, while there was not the tight proximate cause between negligence-induced unseaworthiness and the injury, there was the less stringent cause necessary for a Jones Act claim.
 
 
 28
 More importantly, the focus of the unseaworthiness claim was on the malfunction of the capstan. The negligence claim encompassed a wider range of conduct, including inadequate staffing and improper instruction. Thus, it would have been possible for the jury to find that the capstan was not defective, but that Maritrans was negligent, through its captain, in not properly instructing Reed or providing him assistance in this operation, and that the resulting missteps in the operation caused the injury. The capstan may well have worked like an ordinary capstan. But there was at least some evidence that the capstan was hydraulic, and also testimony that hydraulic capstans will surge and give out line under pressure, which is not a defect but part of their normal functioning. Thus, it is possible to see these verdicts as not inconsistent. Based on the facts introduced at trial, we do not believe that the district court abused its discretion in denying the motion for a new trial on the theory that the answers to the special interrogatories were inconsistent.
 
 IV.
 
 29
 Maritrans also appeals the district court's denial of its motion for a new trial on the grounds that the jury's findings that Maritrans was causatively negligent; that Reed did not have a pre-existing back condition; and that Reed injured his back on board the ENTERPRISE were against the weight of the evidence. Again, our review of this matter is de novo.
 
 
 30
 We need not elaborate each of the pieces of evidence that Maritrans and Reed proffer to support their positions on appeal. It is, to our minds, sufficient to indicate that on each question, the evidence was mixed, with testimony from different sources supporting a resolution of the issues one way or the other. In such instances, particularly where, as here, there are significant discrepancies in the stories of various witnesses and credibility may play a deciding factor, the task is left in the first instance to the jury to sift through the conflicting stories and to find the truth. This is the heart of the American system of justice, and while it is clear that judges can interfere with the verdicts that juries supply, it is only with great care that such an enterprise should be undertaken, and that decision is given largely to the trial judge who shared the experience of viewing the evidence with the jury, and to whose sound discretion this matter is left. Our review of the facts and proceedings in this instance persuades us that the jury and judge performed their tasks conscientiously and properly,[4] and that the judge did not abuse his discretion in refusing to order a new trial.
 
 V.
 
 31
 Finally, Maritrans argues that the court erred in not granting its motion for judgment as a matter of law or for a new trial on the issue of Maritrans' obligation to pay maintenance outside the period provided.
 
 
 32
 "Maintenance is a per diem living allowance, paid so long as the seaman is outside the hospital and has not reached the point of 'maximum cure.' " Pelotto v. L & N Towing Co., 604 F.2d 396, 400 (5th Cir.1979). "[T]he duty arises irrespective of the absence of shipowner negligence and indeed irrespective of whether the illness or injury is suffered in the course of the seaman's employment." Vella v. Ford Motor Co., 421 U.S. 1, 4 (1975) (citation omitted). Payments may be terminated when it is determined by the fact-finder that the seaman has reached maximum medical cure, which has been defined to mean "further treatment will result in no betterment of the seaman's condition." Johnson v. Marlin Drilling Co., 893 F.2d 77, 79 (5th Cir.1990) (internal quotation omitted). "[W]hen there are ambiguities or doubts [as to a seaman's right to receive maintenance and cure], they are to be resolved in favor of the seaman." Vaughan v. Atkinson, 369 U.S. 527, 532 (1962).
 
 
 33
 Maritrans paid Reed maintenance from the time of the accident in April 1988 until the end of December 1988. It did not pay again until June 5, 1989, when it states that it received information that Reed would receive a second operation. It then paid until October 31, 1989, and stopped because it had not received any medical reports. Reed requested maintenance payments for the interim period and the period after his second surgery until he began work again.
 
 
 34
 Once again, there was sufficient evidence introduced by Reed and his testifying physicians to support the jury's answer to the special interrogatory. He was taken off the tug in a stretcher and subsequently received two operations, some time apart, with recuperation and rehabilitation of various sorts throughout. While Maritrans stopped paying maintenance to Reed at some point, it is the province of the factfinder to determine the point of maximum medical cure, which the jury did in rendering its answer to the interrogatory. Again, while Reed and Maritrans introduce conflicting evidence over this matter, it is a factual determination within the province of the jury, controlled by the guiding hand and watchful eye of the district judge to see that no injustice is done. The jury having given its answer, and the judge having found that a new trial was not warranted, our review is for abuse of discretion, and our examination of the facts persuades us that the judgment of the district court should be, and hereby is, affirmed.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 The captain's testimony regarding this conversation is a bit less precise, but does not directly contradict Reed's recounting
 
 
 [2]
 A capstan can be either electric or hydraulic powered. The evidence here was conflicting. The captain testified at trial that it was electric, and Maritrans insists now that it was electric. But the company, in its answers to Reed's discovery interrogatories, stated that it was hydraulic
 
 
 [3]
 Although Maritrans points repeatedly to Reed's statement at trial to the effect that he did not himself think that the presence of others would have changed the result, the jury need not have accepted this testimony as true. Certainly the presence of another member of the regular crew would have provided Reed with the instruction on proper threading of the lines and handling of the capstan that the captain failed to provide
 
 
 [4]
 We reject with particularity Maritrans' characterization, on page 40 of its brief, of the district court's affirmance of the verdict as "cavalier." The district judge participated fully in the trial and issued a reasoned memorandum supporting his refusal to order a new trial. While Maritrans understandably disagrees with the decision of the court, it need not express that disagreement through unwarranted attacks on the court's decision-making